# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                    )
**KATINA COLBERT, *et al.*,**         )
                                    )
        **Plaintiffs,**             )
                                    )
        **v.**                      )      **Civil Action No. 13-531 (RMC)**
                                    )
**DISTRICT OF COLUMBIA, *et al.*,**   )
                                    )
        **Defendants.**             )
_____     )


## OPINION

        Katina Colbert (KC) is an intellectually disabled woman who is unable to care for herself. While living in a group home managed by Total Care Services, Inc., a contractor for the District of Columbia, KC became pregnant and gave birth to a baby girl with severe medical problems. The infant, TC, spent most of her short life in the hospital and died when she was just over a year old. KC's mother, Jacqueline Colbert, sues the District and its contractor, alleging constitutional violations and various torts. The District moves to dismiss or for summary judgment. As explained below, the motion will be granted in part and denied in part, without prejudice.

## I. FACTS

        Jacqueline Colbert, mother of KC and grandmother of TC, brought this suit individually, as next friend of KC, and as personal representative of the Estate of TC against Total Care Services, Inc. (Total Care) and the District of Columbia (collectively, Defendants). Ms. Colbert alleges that in the fall of 2008 at the direction and request of the District, KC was hospitalized and underwent a psychological assessment, which revealed that KC needed care and

supervision twenty-four hours a day, seven days a week. Compl. [Dkt. 1] ¶¶ 7-8. As a result, KC began residing in a group home operated by Total Care, under contract with the District.

Ms. Colbert alleges that despite the fact that the Defendants knew of KC's "prior history of sexual abuse, neglect, her medical conditions, her intellectual disabilities, the medications she was taking, her medical and psychological status, her lack of ability to consistently take her medication, her fertility as well as her past and current sexual activity," *id*. ¶ 9, they failed to provide appropriate supervision and care to protect KC from foreseeable harm, *id*. ¶¶ 11-12. Defendants allegedly "allowed . . . and encouraged [KC] to have unprotected, nonconsensual sexual intercourse with various men for extended periods in 2010," *id*. ¶ 10, including but not limited to "other residents of the facility and men she was meeting on a one time/casual basis," *id*. ¶ 22(c). KC became pregnant and prematurely delivered TC, a baby girl, on April 3, 2011. *Id*. ¶ 10. KC was provided little or no prenatal care. *Id*. ¶ 13.

Because KC was unable to care for her child, Ms. Colbert was awarded sole physical custody of TC. *Id*. ¶ 15. TC was born with significant health problems requiring multiple surgeries and necessitating extended hospitalization; she died from medical complications on April 18, 2012, at the age of 12 months and 9 days. *Id*. ¶¶ 10, 14, 17. It is unclear where KC currently lives. *Compare* Compl. ¶ 6 ("Total Care Services is a licensed provider of services to mentally retarded adults for [the District of Columbia], including a range of services provided to Colbert from 2008 through the present.") *with id*. ¶ 3 ("Colbert is intellectually disabled and is under the care and supervision of the District of Columbia at a facility operated by Innovative Life Solutions.")

The Complaint contains twelve Counts, asserted against both Defendants, unless otherwise noted:

Count I—Negligence;

Count II—Negligent Hiring and Retention (against Total Care);

Count III—Wrongful Birth;

Count IV—Breach of Fiduciary Duty arising from special relationship;

Count V—Negligence Per Se Due to Violation of D.C. Code § 44-504(a)(3) and (4) (against Total Care);

Count VI—Violation of the Fifth Amendment pursuant to 42 U.S.C. § 1983 (against the District);

Count VII—Violation of D.C. Code §§ 7-1301.02 *et seq*. and 7-1305.14;

Count VIII—Violation of D.C. Code §§ 7-1301.02 *et seq*. and 7-1305.13 (against the District);

Count IX—Negligent Infliction of Emotional Distress;

Count X—Intentional Infliction of Emotional Distress;

Count XI—Punitive Damages;

Count XII—Wrongful Death; and

Count XIII—Survival Act.[1]

*Id*. ¶¶ 18-93.  Total Care filed an Answer to the Complaint, but the District of Columbia filed a motion to dismiss or for summary judgment.  *See* Mot. to Dismiss or for Summ. J. [Dkt. 9] (Mot.); Reply [Dkt. 15].  Ms. Colbert opposes.  *See* Opp'n [Dkt. 12].

---

[1] The Survival Act claim is erroneously labeled Count XII in the Complaint, when it is really Count XIII.

## II. LEGAL STANDARDS AND JURISDICTION

### A. Motion to Dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has stated properly a claim. In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (internal quotation marks and citation omitted).

A complaint must "give a defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Although a complaint does not need detailed factual allegations, it must include "more than labels and conclusions" and the facts alleged "must be enough to raise a right to relief above the speculative level." *Id.* "[A] complaint needs *some* information about the circumstances giving rise to the claims." *Aktieselskabet Af 21. Nov. 2001 v. Fame Jeans, Inc.*, 525 F.3d 8, 16 n.4 (D.C. Cir. 2008) (emphasis in original). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must treat the complaint's factual allegations as true, "even if doubtful in fact," *Twombly*, 550 U.S. at 555, but a court need not accept as true legal conclusions set forth in a complaint, *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

**B. Motion for Summary Judgment**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

**C. Jurisdiction**

The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Count VI alleges a violation of K.C.'s rights under the Fifth Amendment of the U.S. Constitution,[2]

---

[2] The Fifth Amendment provides in pertinent part that no person "shall be deprived of life, liberty, or property, without due process of law," *see* U.S. Const. amend. V, and the Fourteenth Amendment similarly provides that "no State shall . . . deprive any person of life, liberty, or

pursuant to 42 U.S.C. § 1983. *See* Compl. ¶ 1. All other Counts assert violations of D.C. law. In its discretion, a federal court may exercise supplemental jurisdiction over local law claims joined with federal claims. *See* 28 U.S.C. § 1367(c).

The Complaint also alleges diversity jurisdiction, presumably because Jacqueline Colbert is a resident of Maryland and Total Care is a resident of Washington, D.C. *See* Compl. ¶¶ 1, 4-6. Diversity jurisdiction applies to suits between citizens of different states where the amount in controversy exceeds the sum of $75,000. *See* 28 U.S.C. § 1332(a). However, diversity jurisdiction does not apply to the District of Columbia; like a State, the District is not a "citizen" of itself and therefore cannot be a "citizen" of a State different from Maryland. *Barwood, Inc. v. District of Columbia*, 202 F.3d 290, 292 (D.C. Cir. 2000); *Long v. District of Columbia*, 820 F.2d 409, 413-14 (D.C. Cir. 1987). In addition, "diversity jurisdiction is lacking if there are any litigants from the same state on opposing sides." *Prakash v. American Univ.*, 727 F.2d 1174, 1178 n.25 (D.C. Cir. 1984).

Diversity is absent in the present case. Jacqueline Colbert sues on her own behalf and as "next friend" of KC, her daughter who resides in the District of Columbia. *See* Compl. ¶ 3. The legal representative of "an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent." 28 U.S.C. § 1332(c)(2). That is, in her capacity as

---

property, without due process of law," *see* U.S. Const. amend. XIV. Because the District of Columbia is a federal enclave, it is subject to the Fifth Amendment and not the Fourteenth, which applies to the States. *Propert v. District of Columbia*, 948 F.2d 1327, 1330 n.5 (D.C. Cir. 1991) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)). The ultimate legal analysis is the same, however, and cases analyzing States' liability under the Due Process clause of the Fourteenth Amendment can be relied upon to analyze the District's liability under the Due Process clause of the Fifth Amendment. *See Piechowicz v. United States*, 885 F.2d 1207, 1214 n.9 (4th Cir. 1989).

next friend of KC, Jacqueline Colbert is deemed to be a citizen of the District.  Since Total Care

also is a resident of the District, there is no diversity of citizenship in this matter.[3]

## III.  ANALYSIS

The District of Columbia moves to dismiss, or for summary judgment, with

regard to the alleged violation of KC's Fifth Amendment rights to due process and equal

protection.  The District contends that the Complaint fails to state a due process claim because

(1) the Complaint does not allege that KC was in *involuntary* custody; (2) KC was voluntarily

committed to the custody of the District and thus the District did not have a *constitutional* duty to

protect her from harm caused by third persons; and (3) the Complaint fails to allege facts

sufficient to show that a D.C. custom or policy was a driving force behind KC's alleged

constitutional injury.  With regard to the Complaint's equal protection claim, the District asserts

that the Complaint fails to allege any facts to support such a claim.  Ms. Colbert opposes.

### A.  Count VI —Fifth Amendment Substantive Due Process Claim

Count VI of the Complaint alleges that the District is liable for violating KC's

substantive due process rights:

> 50.   At all times relevant hereto, Plaintiff Katina Colbert was a
> ward of the District of Columbia and was completely dependent on
> the District of Columbia for her care, protection, and well-being.
>
> 51.   From September 2008 until and including the present, the
> District of Columbia provided [KC] with an environment which
> was unsafe and inadequate to meet her basic needs.    This
> environment included untrained staff who failed to follow
> established procedures by not supervising [KC] to the point where
> she was impregnated without her consent.

---

[3] Ms. Colbert also sues as the personal representative of the Estate of TC.  Section 1332(c)(2),
Title 28, provides that a legal representative of an estate is deemed to be a citizen of the same
state as the decedent.  The Complaint does not indicate where TC was domiciled.

> 52. The District of Columbia, through its contractual relationship with Defendant Total Care, knew or should have known about the substandard quality of care given to Plaintiff Colbert by the Total Care defendants.

Compl. ¶¶ 50-53. Count VI further alleges that the District violated the Fifth Amendment through its deliberate indifference to KC's need for supervision, birth control, and medical care, by placing her in an unsafe environment where there was a high risk of unprotected sexual activity and unwanted pregnancy. *Id.* ¶¶ 58-60.

Ms. Colbert brings her Fifth Amendment claims pursuant to 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Constitutional claims against municipalities under § 1983 are subject to a two-factor analysis. *See Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)). A court must find that the plaintiff suffered "a predicate constitutional violation," *id.* (citation omitted), and that "a custom or policy of the municipality caused the violation," *id.*; *see also Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

First, the Court must "identify the exact contours of the underlying right said to have been violated" and determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998). Here,

Ms. Colbert asserts a substantive due process violation of KC's Fifth Amendment liberty interest.

A citizen's liberty interest, protected by due process, includes a right to be free of damage to bodily integrity and security *caused by the State*.[4]  *See Youngberg v. Romeo*, 457 U.S. 307, 316 (1982); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d, 443, 451 (5th Cir. 1994) (*en banc*).  In contrast, a State's "failure to protect an individual from *private* violence, even in the face of known danger, does not constitute a violation of the Due Process Clause."  *Butera v. District of Columbia*, 235 F.3d 637, 647 (D.C. Cir. 2001) (emphasis added) (citing *DeShaney v. Winnebago County Social Servs. Dep't*, 489 U.S. 189, 197 (1989).  That is, a State has a general constitutional duty to protect individuals from harm caused by State actors, but it does not have a general constitutional duty to protect individuals from harm caused by private actors.  This is because the Due Process Clause limits State power; it is not a guarantee of safety and security.  *DeShaney*, 489 U.S. at 195.  "[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."  *County of Sacramento*, 523 U.S. at 849 (emphasis added).

A State, however, *does* have an affirmative duty to protect an individual from harm caused by third parties in two circumstances:  (1) when government creates a "special relationship" by taking an individual into custody or (2) when government affirmatively endangers the individual.  *DeShaney*, 489 U.S. at 199-201; *Butera*, 235 F.3d at 647-651.

### 1. "Special Relationship" Requires Involuntary Custody

Ms. Colbert insists that the District established a "special relationship" with KC because: she is intellectually disabled, *see* Compl. ¶ 3; she needs supervision twenty-four hours a

---

[4] The Court uses the word "State" to indicate the District of Columbia as well as the 50 States.

day seven days a week, *id.* ¶ 8; she lives under the care and supervision of the District through the District's contractor Total Care, *id.* ¶¶ 5-6; and she is a "ward" of the District, completely dependent on it for her care, protection, and well-being, *id.* ¶ 50. The District seeks dismissal or judgment in its favor, arguing that the Complaint fails to allege that the District took KC into its custody *involuntarily* and, thus, it had not established a "special relationship" as defined in this context. The District argues that since KC was *voluntarily* committed to its care, the District had no Fifth Amendment duty to protect KC from privately-caused harm.

The parties agree that, under Supreme Court law, a State assumes a constitutional duty to protect an individual from harm from third parties when the State has created a "special relationship" by taking the individual into custody. They debate whether such custody must be "involuntary."

The Supreme Court has held that the constitutional duty of care arises in cases involving involuntary custody. In *Youngberg v. Romeo*, 457 U.S. 307 (1982), the mother of a mentally disabled man asserted his constitutional right to safe conditions of confinement and to be free from bodily restraint. The Supreme Court held that the State has a duty to provide "conditions of reasonable care and safety" to a person who is involuntarily committed to a state mental hospital. *Youngberg*, 457 U.S. at 324; *accord Estelle*, 429 U.S. at 103-04 (State has a duty to provide prisoner with medical care because prisoner was deprived of his liberty and was unable to obtain care for himself).

*Youngberg* and *Estelle* dealt with an involuntarily committed mental patient and an incarcerated prisoner, respectively. These cases do not apply when addressing whether the State has a duty to protect an individual who is *not* in State custody. *DeShaney*, 489 U.S. at 201. The Supreme Court addressed the question of whether a State had a constitutional duty of care to

a person not in custody in *DeShaney v. Winnebago County Social Services.*  There, the issue was whether a State had a duty of care to protect a child from third party harm, where the child was not in State custody.  The Supreme Court determined that a child who was severely beaten by his father when in his father's custody did not have a due process claim against a State social service agency—even though agency personnel had reason to know of the physical abuse and failed to remove the child from his father's custody.  *Id.* at 202-03.

The *DeShaney* Court first explained that a State's duty of care under tort law is broader than a State's narrow duty of care under the Constitution:

> It may well be that, by voluntarily undertaking to protect [the child] against a danger it concededly played no part in creating, the State acquired a duty under state tort law to provide him with adequate protection against that danger.  But the claim here is based on the Due Process Clause of the Fourteenth Amendment, which, as we have said many times, does not transform every tort committed by a state actor into a constitutional violation.

*Id.* at 201-02 (citations omitted).  The *DeShaney* Court further explained that whether the State had a constitutional duty of care hinges on whether the victim was in State custody:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.  The affirmative duty to protect arises *not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.*  In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interest against harms inflicted by other means.

*DeShaney*, 489 U.S. at 200 (citations omitted).  Critically, the Supreme Court found that a special relationship is created when a State "takes a person into its custody and holds him there

*against his will.*"  *Id.* at 199-200 (emphasis added).  Such deprivation of liberty gives rise to a State duty to "assume some responsibility for [the person's] safety and general well-being" because it has "render[ed] him unable to care for himself."  *Id*. at 200.

While the Supreme Court did not address the question of what *type* of State custody gives rise to a constitutional duty of care, the majority of the Circuits that have addressed the question have found that only *involuntary* custody triggers a constitutional duty of care to protect from harm caused by third persons, relying on the language in the *DeShaney* decision that a special relationship arises only when a State "takes a person into its custody and holds him there against his will," *id*. at 199-200, "through incarceration, institutionalization, or other similar restraint of personal liberty," *id*. at 200.  The First, Second, Third, Fifth, and Ninth Circuits have held that only *involuntary* commitment to State custody gives rise to a "special relationship" and thus a constitutional duty of care, whereas voluntary commitment does not. *See Monahan v. Dorchester Counseling Center*, 961 F.2d 987 (1st Cir. 1992); *Brooks v. Guiliani*, 84 F.3d 1454 (2d Cir. 1996); *Torisky v. Schweiker*, 446 F.3d 438 (3d Cir. 2006); *Walton v. Alexander*, 44 F.3d 1297 (5th Cir. 1995) (*en banc*); *Campbell v. State of Washington Dep't of Social & Health Servs*., 671 F.3d 837 (9th Cir. 2011).  These Circuits agree that "the involuntary nature of the commitment [is] determinative."  *Brooks v. Guiliani*, 84 F.3d at 1466.  There are no cases directly on point in the D.C. Circuit.

In *Campbell*, a developmentally delayed adult, Justine Booth, was found unconscious in a bathtub while she was in the care of the State of Washington's State Operated Living Alternative (SOLA) program; Ms. Booth died a week later.  671 F.3d at 839.  Her mother, Ms. Campbell, sued, asserting that the State deprived Ms. Booth of her due process right to safe physical conditions while she was in State custody.  Ms. Booth was a cognitively disabled adult

with an IQ of fifty-nine; she had been diagnosed with a severe seizure disorder.  *Id*.  When she was eighteen, she and her mother requested that she be placed in the SOLA program so that she could live a "somewhat independent" life; thereafter, Ms. Booth moved into a SOLA-operated home with two other developmentally-disabled roommates.  *Id*. at 844.  Ms. Booth could withdraw from the SOLA program at any time.  *Id*.  Even so, Ms. Campbell argued that her daughter's commitment to State custody in fact was involuntary because: (1) SOLA placed locks on the doors of the home, preventing residents' ability to leave; (2) the State controlled the home where Ms. Booth lived; (3) the State controlled Ms. Booth's transportation, diet, and wardrobe; and (4) the State controlled how and when Ms. Booth bathed.  *Id*. at 843.

The Ninth Circuit held that the State of Washington had no constitutional duty of care toward Ms. Booth because her participation in SOLA was voluntary.  671 F.3d at 843-845.  The Circuit found that the restraints on liberty cited by her mother were merely part of SOLA's efforts to ensure Ms. Booth's safety and that the State's "performance of the very acts for which an individual voluntarily enters [S]tate care does not transform the custodial relationship into an involuntary one."  *Id*. at 844.  The *Campbell* court also rejected the argument that Ms. Booth's limited mental abilities rendered her under the control of the State, *i.e.* that "[d]ue to her cognitive impairments she could not leave the SOLA home without permission from her caregivers."  *Id*.  Ms. Booth's intellectual limitations were "not the product of state action; they were limitations she brought with her into custody" and there was no evidence that SOLA employees took actions that caused her mental capacity to worsen.  *Id*.  The Circuit concluded that Ms. Booth and her mother had requested placement in the SOLA program and could withdraw that request at any time, rendering the State's custody of Ms. Booth a "far cry" from

"institutionalization or other similar restraint of personal liberty" sufficient to show that the she was held "against [her] will." *Id*. (citing *DeShaney*, 489 U.S. at 199-201).

Similarly, in *Walton*, the Fifth Circuit held that a State school for the deaf had no constitutional duty to protect a hearing-impaired student from sexual assault by another student. The plaintiff argued that the State had created a special relationship with the student who resided at the school because the school severely restricted the conditions under which he could leave, and controlled his schedule of duties, classes, and daily activities. The Fifth Circuit found that the student "attended the school through his own free will (or that of his parents) without any coercion by the state," that he had the "option of leaving at will," and that "[a]lthough [his] freedom was curtailed, it was he who voluntarily subjected himself to the rules and supervision of school officials." 44 F.3d at 1305; *accord Stevens v. Umsted*, 921 F. Supp. 530, 537 (C.D. Ill. 1996) (when a visually-impaired, developmentally-disabled student voluntarily attended a state-run school, the State did not have a constitutional duty to protect him from sexual assault by a fellow student).

The First Circuit reached the same conclusion in *Monahan v. Dorchester*. While being transported from a mental health center to a group home, Mr. Monahan leapt out a van and was hit by a car. He sued the Commonwealth of Massachusetts, claiming that his injury was caused by the State's failure to provide adequate psychiatric treatment and supervision in violation of his right to substantive due process. The First Circuit held that the State did not have a constitutional duty of care to protect Mr. Monahan from third-party harm since he had been voluntarily, not involuntarily, committed to its care. Because Massachusetts did not restrain Mr. Monahan "against his will," the Constitution did not impose any responsibility on the State for

his safety and well-being vis-à-vis third parties. 961 F.2d at 992 (quoting *DeShaney*, 489 U.S. at 199-200). The First Circuit explained:

> To be sure, Monahan's mental condition may have made him functionally dependent on his caretakers, but no more so than is true of many other noncommitted ill persons in a hospital or outpatient setting. His helplessness was not attributable to the state's having taken him into custody involuntarily. . . . Here, where it was Monahan's own mental condition alone that impinged upon his freedom to leave, it was not the state that deprived him of that freedom.

*Id*. The Third Circuit similarly held in *Torisky v. Schweiker*, 446 F.3d 438, that the State did not owe a constitutional duty of care to a mental health patient in state custody when the patient was free to leave. "[W]hen a patient provides valid consent to enter a state mental treatment facility, there is no deprivation of liberty at all." *Torisky*, 446 F.3d at 446.

While the D.C. Circuit has not analyzed whether voluntary custody can give rise to a constitutional duty of care, it has addressed the circumstances under which a "special relationship" can arise. In *Butera*, a mother sued the District of Columbia and members of the Metropolitan Police Department alleging that her son's due process rights were violated when he was beaten to death while working as an undercover operative for the police department. *Butera*, 235 F.3d at 641. Relying on *Harris v. District of Columbia*, 932 F.2d 10, 13-15 (D.C. Cir. 1991), to find that "custody," for the purpose of determining whether a special relationship has been created, is "narrowly construed," *Butera* held that the District did not have a constitutional duty of care and was not liable for a violating the victim's due process rights under § 1983. *Butera*, 235 F.3d at 648; *compare Smith v. District of Columbia*, 413 F.3d 86, 95 (D.C. Cir. 2005) (holding that the District of Columbia had a constitutional duty of care to an adjudicated delinquent youth who was committed to the District's custody involuntarily and noting that "formal indicia" of commitment were relevant to whether a "special relationship" existed).

*Harris* exemplifies this Circuit's narrow reading of "custody." The suit was brought after Mr. Harris's death caused by a drug overdose while the decedent was in police "custody." Mr. Harris was at a nightclub when he began sweating profusely, rolling on the floor, and screaming that he did not want to die. *Harris*, 235 F.2d at 11. Believing that Mr. Harris was overdosing on phencyclidine (PCP), an employee of the club flagged down police officers. The officers tried to speak to Mr. Harris, but he was nonresponsive and continued to flail violently and to rant and rave. *Id*. To ensure Mr. Harris's safety, the officers placed him in handcuffs and leg restraints and locked him in a police van while they completed the paperwork necessary to take Mr. Harris to a psychiatric hospital. *Id*. When an officer checked on Mr. Harris, he tried to escape and they struggled, bumping Mr. Harris's head in the process. *Id*. at 12. When an officer next checked, Mr. Harris had stopped breathing so the officers took him to a hospital emergency room instead of the psychiatric hospital. Mr. Harris was pronounced dead shortly after he arrived at the emergency room. *Id.*

Mr. Harris's estate brought suit against the officers, but the D.C. Circuit held that they were protected by qualified immunity because there was no clearly established constitutional duty to obtain earlier medical assistance for Mr. Harris. As support for this conclusion, the Circuit found that: "Harris had not been formally committed, either by conviction, involuntary commitment, or arrest, to the charge of the District" and thus "the government had not entered into a special relationship with Harris." *Id*. at 14. That is, Harris was not in involuntary custody—despite the fact that the officers had placed him in handcuffs and leg restraints and held him in the back of a police van. *Id*. at 11.[5]

---

[5] *But see Ringuette v. City of Fall River*, 888 F. Supp. 258, 268 (D. Mass. 1995) (State had a constitutional duty to protect persons who are taken into protective custody because of incapacitation and who lack the capacity to give knowing, intelligent and voluntary consent).

While it might be argued that Mr. Harris was under "arrest," this Circuit relied on an earlier point in the chain of events leading to Mr. Harris' handcuffs-and-locked-in-van circumstance: "[T]he special relationship here, if any, . . . had to be created by the very act of the officers in picking up Harris in response to his pleas for help. Harris' inability to take care of himself, moreover, was not due to anything the officers did but was instead a direct result of his ingestion of PCP." *Id.* at 361. The Circuit rejected the assertion that the State assumes a constitutional duty of care by making initial efforts to help someone who by reason of his own actions is unable to help himself, thereby refusing to "constitutionalize" the tort law principle that "although no one has an obligation to rescue a person in need, if they attempt a rescue they assume a duty to perform it well, for in attempting the rescue they are reducing the chance that a more skilled individual might come to the person's aid." *Id.* at 362.

Some courts have rejected the proposition that *DeShaney* limited *Youngberg* to involuntarily-committed persons. The Fourth Circuit, for example, rejected the claim that the State had no constitutional duty of care to a suicidal individual taken into custody at his family's request. *See Buffington v. Baltimore County*, 913 F.2d 113 (4th Cir. 1990). *Buffington* involved an individual who committed suicide while he was in police custody awaiting emergency psychiatric treatment. The government argued that it had no constitutional duty of care under *DeShaney* because the deceased had been taken into custody at his family's request. *Id.* at 119. The Fourth Circuit viewed this argument as focusing on the *reason* for taking an individual into custody and found that the reason for custody is not relevant to deciding whether the government had a constitutional duty of care. *Id.* The court determined that the State had an affirmative due process duty to prevent the detainee from committing suicide. *Id.* at 119-120; *accord Merideth v. Grogan*, 812 F. Supp. 1223 (N.D. Ga. 1992) (intoxicated suicidal individual who was jailed at

the request of his family was entitled to due process protection), *aff'd*, 985 F.2d 579 (11th Cir.

1993) (Table). The Seventh Circuit also has rejected the proposition that the State has a

constitutional duty of care only where custody is involuntary. *See Camp v. Gregory*, 67 F.3d

1286, 1296 (7th Cir. 1995) (just because a child was voluntarily placed in foster care did not

mean that that the State could never be liable for a subsequent deprivation of due process);

*McMahon v. Tompkins County*, Civil No. 95-1134, 1998 WL 187421, *3 (N.D.N.Y. Apr. 14,

1998) (voluntary placement in foster care triggers the same due process duty of care that

involuntary placement triggers).

   While puzzled by the finding in *Harris* that an incapacitated person, in handcuffs

and held in a police van, was not "involuntarily" in police custody, this Court is bound by D.C.

Circuit precedent. In light of *Butera*, which recently relied on *Harris* and its very narrow

construction of "custody," this Court is bound to a narrow interpretation of "custody" for the

purpose of triggering a constitutional duty of care. Therefore, in line with the First, Second,

Third, Fifth, and Ninth Circuits and their interpretation of the Supreme Court's decision in

*DeShaney*, this Court finds that only involuntary commitment triggers the District's

constitutional duty of care to protect an individual from harm caused by non-state actors. The

facts alleged here—that KC was a "ward" of the District, that she was intellectually disabled,

unable to attend to her own daily needs, and *encouraged* to have nonconsensual sex with other

residents and men she met on a one time basis—do not assert that she was involuntarily

committed to District custody, giving rise to a constitutional to prevent harm to her from third

persons.

   The Court is mindful that whether KC's confinement was voluntary or

involuntary is question of fact, not of formality. "[C]ommitments formally labeled as

'voluntary' may arguably amount to de facto deprivations of liberty from their inception."
*Torisky*, 446 F.3d at 446; *see Harvey v. Mohammed*, 841 F. Supp. 2d 164, 186-87 (D.D.C. 2012)
(describing D.C. statutory scheme governing commitment of mentally retarded adults).  Further,
a commitment that was initially voluntary "may, over time, take on the character of an
involuntary one."  *Torisky*, 446 F.3d at 446; *accord Shelton v. Arkansas Dep't of Human Servs.*,
677 F.3d 837, 840 (8th Cir. 2012) (a patient's status at the time of admission is not necessarily
dispositive because it may change later from voluntary to involuntary).

The threshold question in the present case is whether KC was committed to the
custody of the District voluntarily or involuntarily.[6]  Ms. Colbert alleges that KC was a "ward"
but does not assert facts sufficient to show that KC was "involuntarily" committed to the custody
of the District.  Count VI, alleging a constitutional violation under § 1983, will be dismissed
without prejudice.

### 2.  Endangerment Requires Affirmative Action

Ms. Colbert also attempts to state a claim under the "State endangerment" theory
in her opposition brief.  *See* Opp'n at 24-26.  "[U]nder the State endangerment concept, an
individual can assert a substantive due process right to protection by the District of Columbia
from third-party violence when District of Columbia officials *affirmatively act* to increase or
create the danger that ultimately results in the individual's harm."  *Butera*, 235 F.3d at 651
(emphasis added).  Here, Ms. Colbert alleges that the District failed to take action—that it failed

---

[6] If KC were involuntarily committed, the District of Columbia might be liable under § 1983, but
only if Ms. Colbert can establish that the District was so deliberately indifferent to KC's
constitutional rights that it "shocks the conscience."  *Butera*, 235 F.3d at 651-52 (quoting *County
of Sacramento*, 523 U.S. at 847 n.8); *accord Estate of Phillips v. District of Columbia*, 455 F.3d
397, 403 (D.C. Cir. 2006).  This "stringent requirement exists to differentiate substantive due
process, which is intended only to protect against arbitrary government action, from local tort
law."  *Butera*, 235 F.3d at 651.

to supervise and failed to provide medical care—not that it took any affirmative action that increased or created the danger that resulted in harm to KC. Because the Complaint fails to allege any affirmative action by District officials, it fails to allege a claim pursuant to the "State endangerment" theory.

### B. Equal Protection

In addition to alleging that KC's liberty interests were violated, Count VI also attempts to allege that her Fifth Amendment right to equal protection was violated. To allege an equal protection claim, a plaintiff must assert that the government intentionally treated her differently from others who were similarly situated and that there is no rational basis for the difference in treatment. *3883 Conn. LLC v. District of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir. 2003) (citing *Village of Willowbrook v. Olech*, 529 U.S. 562, 564 (2000)). Gender-based classifications give rise to heightened scrutiny, as a "classification relying explicitly upon gender peculiarly suggests that the [S]tate is pursuing an improper purpose." *Pitts v. Thornburgh*, 866 F.2d 1450, 1454 (D.C. Cir. 1989).

The Complaint, however, makes no allegation that the District intentionally treated KC different from similarly situated individuals or that it intentionally discriminated against her based on her gender. The Complaint merely states the legal conclusion that KC's right to equal protection was violated:

> 61. The actions and policies of the Defendant as described herein denied [KC] the equal protection of the law by infringing [KC's] right to be free from harm and to have adequate health and habilitative care to protect her from dangerous, unprotected sexual activity and unwanted pregnancy.

> 62. As a direct result of the actions and policies of Defendant as described herein, [KC] suffered a denial of her equal protection rights and an unconstitutional deprivation of liberty in violation of

> her rights under the Fifth Amendment to the United States
> Constitution.

Compl. ¶¶ 61-62. The Court is not required to accept as true legal conclusions set forth in the

Complaint, *see Iqbal*, 556 U.S. at 678, and "while legal conclusions can provide the framework

of a complaint, they must be supported by factual allegations." *Id*. at 679.

In response to the motion to dismiss, Ms. Colbert contends that "men in the care

of [the District and Total Care] were not allowed and encouraged to have sex with strangers, nor

coerced into having sex with staff" and that KC was.[7] Opp'n at 24. Ms. Colbert's opposition

brief, however, does not cure the inadequacy of the Complaint because a complaint may not be

amended by filing an opposition to a motion to dismiss. *Arbitraje Casa de Cambio, S.A. de C.V.*

*v. U.S. Postal Serv*., 297 F. Supp. 2d 165, 170 (D.D.C. 2003). Thus, the equal protection claim

will be dismissed without prejudice.

### C. Procedural Due Process

Ms. Colbert also attempts to make out a procedural due process claim under an

"entitlement theory" by alleging she was denied procedural due process rights provided by D.C.

Code § 7-1305.10(e) and (f). *See* Opp'n at 26-28. D.C. Code § 7-1305.10(e) and (f) provide:

> (e) Alleged instances of mistreatment, neglect or abuse of any
> individual shall be reported immediately to the Director and the
> Director shall inform the individual's counsel, parent or guardian
> who petitioned for the commitment, and the individual's advocate
> for a person with an intellectual disability of any such instances.
> There shall be a written report that the allegation has been
> thoroughly and promptly investigated (with the findings stated
> therein). Employees of facilities who report such instances of
> mistreatment, neglect, or abuse shall not be subjected to adverse
> action by the facility because of the report.

---

[7] The allegation in the Opposition brief extends further than the allegations of the Complaint.
The Complaint does not allege that KC had sex with staff at Total Care, and instead alleges that
she had sex with "other residents of the facility and men she was meeting on a one time/casual
basis." Compl. ¶ 22.

> (f) An individual's counsel, parent or guardian who petitioned for commitment and an individual's advocate for a person with an intellectual disability shall be notified in writing whenever restraints are used and whenever an instance of mistreatment, neglect or abuse occurs.

This procedural due process allegation is made in the Opposition to the District's motion and not in the Complaint. Again, a complaint may not be amended via an opposition to a motion to dismiss, *see Arbitraje*, 297 F. Supp. 2d at 170, and no procedural due process claim will be considered.

### D. Custom or Policy

The District also moves to dismiss Count VI for failure to allege that a D.C. custom or policy caused the alleged constitutional violation. To state a claim against the District under 42 U.S.C. § 1983, a plaintiff must allege that a custom or policy of the District of Columbia caused the constitutional violation. *Feirson v. District of Columbia*, 506 F.3d 1063, 1066 (D.C. Cir. 2007) (citing *Monell*, 436 U.S. at 694). Further, to state a claim for failure to train or supervise, a plaintiff must allege "that the need for more or different training or supervision was so obvious and the inadequacy so likely to result in a violation of constitutional rights that the policymakers can be said to have been deliberately indifferent to the need," with facts to support the allegation. *Rogala v. District of Columbia*, 161 F.3d 44, 56 (D.C. Cir. 1998) (citing *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989)). "Pleading a single instance of a constitutional violation—that does not itself establish municipal policy—without connecting it to an existing, unconstitutional policy is not sufficient to state a claim under § 1983." *Trimble v. District of Columbia*, 779 F. Supp. 2d 54, 58 (D.D.C. 2011).

The Complaint sets forth only conclusory allegations that the alleged constitutional violations were caused by a D.C. custom or policy. The Complaint alleges:

53. At all times relevant hereto, it was the policy of the District of Columbia . . . to provide unsafe surroundings for persons in their care, without adequate supervision and medical care and to neglect to monitor those environments to ensure that appropriate medical and habilitative care was provided. This policy and procedure was intentional and/or deliberately indifferent to the Constitutional rights of [KC] and caused the injuries complained of herein.

54. Upon information and belief, other individuals with policy making authority for the District of Columbia tacitly approved of or ratified the actions of lower ranking officials in allowing Colbert to reside in the conditions described herein. Such conduct by policymakers amounts to [an] unlawful policy or custom for which the District of Columbia is liable.

55. Upon information and belief, it was the custom of the District of Columbia to improperly place intellectually disabled residents in unsafe environments such as that provided by the Total Care Defendants without adequate supervision and medical care as required by law.

Compl. ¶¶ 53-55. These threadbare recitals are insufficient to state a claim. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.")

Ms. Colbert offers additional allegations in her responsive pleading. She asks the Court to take judicial notice that the District of Columbia has been judicially found to be deliberately indifferent to the needs of developmentally disabled persons in its care. She notes *Evans v. Williams*, 139 F. Supp. 2d 79 (D.D.C. 2001), in which the district court approved a settlement between D.C. and a class of disabled individuals to remedy the District's failure to provide adequately for their health, safety, and welfare. The class consisted of individuals who resided at a facility called Forest Haven, since closed, as a result of an involuntary commitment. *See Harvey v. Mohammed*, 841 F. Supp. 2d 164, 187 (D.D.C. 2012) (describing *Evans*). The *Evans* court held in 2007 that the D.C. Mental Retardation and Developmental Disabilities Administration (MRDDA) had seriously and continuously failed to comply with court orders

regarding health, safety, and welfare of disabled persons at Forest Haven. *Evans v. Fenty*, 480 F. Supp. 2d 280, 298, 325 (D.D.C. 2007). The plaintiff in *Harvey v. Mohammed* established the existence of a D.C. policy of disregard for the medical needs of disabled individuals by relying on the *Evans* case. 841 F. Supp. 2d at 187. However, the *Harvey* plaintiff had been an *Evans* class member. *Id.*

MRDDA no longer exists; it has been replaced by the Department on Disability Services (DDS). *See Evans v. Fenty*, 701 F. Supp. 2d 126, 137-38 (D.D.C. 2010). The new policies of DDS have been found to have brought the District into compliance with three parts of the nine areas specified by the *Evans* consent orders: staff training, safeguarding personal possessions, and adequate budget. *See Evans v. Gray*, Civil No. 76-293(ESH), 2012 WL 5305790, at *1 (Oct. 26, 2012). Ms. Colbert does not allege any new facts since 2012 that would alter the *Evans* findings.

Critically, Ms. Colbert's reliance on the *Evans* consent orders does not provide a factual basis for the allegation that the District of Columbia had a custom or policy that affected KC in 2010. She has not alleged facts showing that KC was a member of the *Evans* class. She has not alleged that, during the relevant time period, DDS had the same policies of indifference to medical needs that MRDDA had. Accordingly, due to the failure to allege the requisite custom or policy under *Monell*, Count VI will be dismissed without prejudice.

### E. Punitive Damages

Count XI of the Complaint claims punitive damages against the District, which has moved to dismiss because it is immune from punitive damages unless extraordinary circumstances exist, *see Daskalea v. District of Columbia*, 227 F.3d 433, 447 (D.C. Cir. 2000), which are not alleged here. Ms. Colbert has not responded. *See Hopkins v. Women's Div., Gen.*

*Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004). Count XI will be dismissed against the District; it remains against Total Care.

### F. Supplemental Jurisdiction

Each of Ms. Colbert's remaining claims alleges violations of D.C. law, and the Court maintains only supplemental jurisdiction over such claims. *See* 28 U.S.C. § 1367(c). However, if the Court dismisses the federal law claims in this case over which it has original jurisdiction, the Court may decline supplemental jurisdiction under § 1367(c). 28 U.S.C. § 1367(c)(3); *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005). The decision whether to exercise supplemental jurisdiction after dismissal of all federal claims is "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 129 S. Ct. 1862, 1866 (2009). In exercising such discretion, district courts consider judicial economy, convenience, comity, and fairness. *Shekoyan*, 409 F.3d at 424. In the usual case, these factors point toward declining jurisdiction. *Id.* (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

Because the Court will dismiss without prejudice Count VI, the only federal law claim in this case and will grant Ms. Colbert the opportunity to amend the Complaint, the Court cannot determine at this juncture whether it will elect to exercise supplemental jurisdiction over the remaining D.C. law claims. The District's motion to dismiss or for summary judgment with regard to the D.C. law claims will be denied without prejudice.

## IV. CONCLUSION

For the reasons set forth above, the motion to dismiss or for summary judgment filed by the District of Columbia [Dkt. 9] will be granted in part and denied in part. Count VI (Fifth Amendment claim) will be dismissed without prejudice; Count XI (punitive damages claim) will be dismissed as to the District of Columbia with prejudice. The District of Columbia's motion will be denied without prejudice as to the D.C. law claims. Ms. Colbert will have a reasonable period of time to file an amended complaint; if she fails to timely file, the dismissal of Count VI shall be deemed with prejudice. A memorializing Order accompanies this Opinion.


Date:  December 13, 2013                                          _____/s/_____
                                                                 ROSEMARY M. COLLYER
                                                                 United States District Judge