## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**JACQUELINE COLBERT, as next**    )
**friend of Katina Colbert,** *et al.*,    )
                       )
        **Plaintiffs,**      )
                       )
      **v.**            )      **Civil Action No. 13-531 (RMC)**
                       )
**DISTRICT OF COLUMBIA,** *et al.*,    )
                       )
        **Defendants.**    )
_____)

## OPINION

        Jacqueline Colbert, mother of Katina Colbert (K.C.), brought this suit

individually, as next friend of K.C., and as personal representative of the Estate of K.C.'s

deceased infant child, T.C.  Based on an alleged violation of K.C.'s constitutional rights as well

as other grounds, Ms. Colbert claims a right to damages from the District of Columbia and its

contractor, Total Care Services, Inc.  K.C. is intellectually disabled.  In 2008, K.C. was

hospitalized and underwent a psychological assessment, which revealed that K.C. needed care

and supervision twenty-four hours a day, seven days a week.  As a result, K.C. began residing in

a group home operated by Total Care, under contract with the District.

        Proper supervision and reasonable care allegedly were lacking.  K.C. allegedly

had unprotected, nonconsensual sex and became pregnant.  With little or no prenatal care, she

gave birth to T.C. in 2011.  T.C. was born with significant medical problems and died when she

was just over a year old.  The District of Columbia moves to dismiss, or alternatively for

summary judgment, arguing that it is not constitutionally liable because K.C. was voluntarily

committed to its care.  The Court finds that Ms. Colbert's constitutional claim is the only

potentially viable basis for federal jurisdiction here and will order limited discovery to determine

if the claim may proceed.

## I.  FACTS

In September 2008, K.C. was 31 years old and living in an emergency shelter for

the homeless in the District of Columbia.  Am. Compl. [Dkt. 29] ¶ 87.  She had three small

children who were in the custody of D.C. Child and Family Services.  *Id.*  For reasons that are

unexplained, K.C. was hospitalized and referred for a psychological assessment by Words of

Life Development Center.  *Id.*  Dr. Tonya Lockwood, a licensed psychologist, conducted the

assessment on September 2 and 4, 2008.  Surreply [Dkt. 51], Ex. 2 (Lockwood Report) at 1.  Dr.

Lockwood determined that K.C. had an IQ of 53; that she functioned "within the moderate range

of mental retardation cognitively and adaptively;"[1] that she needed "medical and psychiatric

stabilization;" that she needed to be referred to a neurologist to "rule out . . . dementia;" that she

suffered from "symptoms of Post Traumatic Stress Disorder;" and that she had "symptoms of

depression as well as grief related to the loss of her children and her own mortality."  Lockwood

Report at 1, 8.[2]  The psychologist determined that K.C. was "unable to make independent

decisions with regard[ ] to her finances, medical treatment, housing, habilitation, and life

planning," and recommended "emergency residential placement in a community residential

facility with on-site medical support as well as 24-hour supervision."  *Id.* at 8.  Soon thereafter,

K.C. moved into a group home operated by Total Care under contract with the District.

---

[1] Despite Dr. Lockwood's finding that K.C. was "moderately" retarded, Ms. Colbert
characterizes K.C.'s level of mental disability variously as "moderate," "profound," and
"severe."  *See* Am. Compl. ¶¶ 9-10.

[2] Plaintiff filed only pages 1, 8 and 9 of what appears to be a nine page report.

Ms. Colbert alleges that the District of Columbia "referred" K.C. for the psychological assessment; that upon receiving the assessment, the District "assumed custody" of K.C.; that the District began to act as K.C.'s "guardian;" and that K.C. "has not been free to leave the District's custody since September 2008."  Am. Compl. ¶¶ 87-91.

Due to K.C.'s "retardation and low developmental age," Ms. Colbert alleges that she was incapable of consenting to sexual activity.  *Id.* ¶ 11.  K.C. had a prior history of sexual abuse.  *Id.* ¶ 10, 14, 18.  According to the Amended Complaint, K.C. "was facilitated and encouraged by Defendants to have unprotected, nonconsensual sexual intercourse with various men in 2010" and thereby became pregnant.  *Id.* ¶ 17.  She delivered T.C. on April 3, 2011.  K.C. and her mother, Ms. Colbert, shared joint legal custody of T.C., but because K.C. was unable to care for her child, Ms. Colbert was awarded sole physical custody of T.C.  *Id.* ¶¶ 3, 5, 21.  T.C. was born with medical conditions that required surgery, hospitalization, and medical care; T.C. died on April 18, 2012.  *Id.* ¶¶ 17, 54.

Kelvin Martinez, an intellectually disabled man who lived in the same group home as K.C., claimed that he was T.C.'s father.  *See* Mot. to Intervene [Dkt. 16].  Mr. Martinez, through his guardian, has asserted that K.C. and her mother acknowledged his paternity and identified him as T.C.'s father in the custody case regarding T.C.  *See Colbert v. Colbert*, 2011 DRB 1427 (D.C. Superior Ct.).  The D.C. Superior Court granted visitation rights to Mr. Martinez.  Reply [Dkt. 21], Ex. 3 (Custody Order).  However, paternity was never established because Mr. Martinez is indigent and he was unable to find a public source to pay for a paternity test.[3]  Reply [Dkt. 21] at 5.

---

[3]  Mr. Martinez moved to intervene in this case, but the Court denied his motion.  *See* Op. [Dkt. 40]; Order [Dkt. 41].

Ms. Colbert, for herself, on behalf of K.C., and on behalf of the Estate of T.C., filed an Amended Complaint, which contains fifteen Counts asserted against both the District of Columbia and Total Care, unless otherwise noted:

Count I—Negligence;

Count II— Wrongful Birth;

Count III—Breach of Fiduciary Duty arising from special relationship;

Count IV—Negligent Infliction of Emotional Distress;

Count V— Intentional Infliction of Emotional Distress;

Count VI—Wrongful Death;

Count VII—Survival Act;

Count VIII—Violation of D.C. Code § 44-504(a)(3) and (4) (negligence per se) (against Total Care);

Count IX—Violation of D.C. Code §§ 7-1301.02 *et seq.* and 7-1305.14 (right to care of persons with intellectual disabilities);

Count X—Violation of D.C. Code §§ 7-1301.02 *et seq.* and 7-1305.13 (right to adequate habilitation program) (against the District);

Count XI—Violation of the Fifth Amendment pursuant to 42 U.S.C. § 1983 (against the District);

Count XII—Violation of Title IX, 20 U.S.C. § 1681;

Count XIII—Violation of the Rehabilitation Act, 29 U.S.C. § 701;

Count XIV—Violation of the D.C. Consumer Protection Procedures Act, D.C. Code §§ 28-3901 *et seq.* (against Total Care); and

Count XV—Punitive Damages (against Total Care).

The District of Columbia filed a motion to dismiss or for summary judgment, *see* Mot. to Dismiss or for Summ. J. [Dkt. 34] (MSJ) and Reply [Dkt. 49], and Ms. Colbert opposes, *see*

Opp'n [Dkt. 47]; Surreply [Dkt. 51].  The District moves, *inter alia*, to dismiss all of the federal

law claims, Counts XI, XII, and XIII.  Total Care filed a motion for partial dismissal, including

the federal law claims.  *See* Mot. for Partial Dismissal [Dkt. 32]; Total Care Reply [Dkt. 44].

Ms. Colbert also opposes Total Care's motion.  *See* Opp'n [Dkt. 39].

## II.  JURISDICTION AND LEGAL STANDARDS

### A.  Jurisdiction

Ms. Colbert alleges that the Court has federal question jurisdiction under 28

U.S.C. § 1331 and supplemental jurisdiction over the D.C. law claims under 28 U.S.C.

§ 1367(c).[4]  Am. Compl. ¶ 1.  The Amended Complaint sets forth the following federal law

claims:  Count XI—Violation of the Fifth Amendment pursuant to 42 U.S.C. § 1983 (against the

District); Count XII—Violation of Title IX, 20 U.S.C. § 1681 (against the District and Total

Care); and Count XIII—Violation of the Rehabilitation Act, 29 U.S.C. § 701 (against the District

and Total Care).  All other Counts assert violations of D.C. law.

As explained below, the motions to dismiss will be granted as to two of the

federal law claims (Counts XII and XIII).  The Court will hold in abeyance its ruling on whether

the sole remaining federal law claim (Count XI) will be dismissed, as limited discovery is needed

to determine whether Count XI may go forward.

---

[4] The Amended Complaint does not allege diversity jurisdiction.  Diversity jurisdiction applies to suits between citizens of different states where the amount in controversy exceeds the sum of $75,000, *see* 28 U.S.C. § 1332(a).  Diversity jurisdiction does not apply to the District of Columbia; like a State, the District is not a "citizen" of itself and therefore cannot be a "citizen" of a State different from the residence of a plaintiff.  *Barwood, Inc. v. District of Columbia*, 202 F.3d 290, 292 (D.C. Cir. 2000).  Further, diversity jurisdiction is lacking because there are litigants from the District on opposing sides.  *See Prakash v. American Univ.*, 727 F.2d 1174, 1178 n.25 (D.C. Cir. 1984).  Jacqueline Colbert sues as "next friend" of K.C., who resides in the District of Columbia, as does Total Care.  *See* 28 U.S.C. § 1332(c)(2) (the legal representative of an incompetent person is deemed to be a citizen of the same State as that person).

In cases where all of the federal law claims are dismissed before trial, courts usually decline supplemental jurisdiction over the remaining local law claims. *See* 28 U.S.C. § 1367(c)(3); *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *Araya v. JPMorgan Chase Bank, N.A.*, No. 13-7036, 2014 WL 7373492 at *13 (D.C. Cir. Dec. 30, 2014) (quoting *Financial General Bankshares, Inc. v. Metzger*, 680 F.2d 768, 777 (D.C. Cir. 1982) ("When a District Court reaches out to decide unsettled issues of state law despite the pretrial dismissal of all federal claims, its actions may be an abuse of discretion."). Thus, the Court addresses only the federal law claims in this Opinion. In the event that all of the federal law claims are dismissed, the Court decline to exercise supplemental jurisdiction over the D.C. law claims, and those claims will be dismissed without prejudice.

### B.  Motion to Dismiss

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face. Fed. R. Civ. P. 12(b)(6). A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Id.* at 570. A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Id.*, 550 U.S. at 555. But a

court need not accept as true legal conclusions set forth in a complaint. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

### C.  Motion for Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.  In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675.  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III.  ANALYSIS

### A.  Count XI—Fifth Amendment Due Process Claim Against the District

In Count XI of the Amended Complaint, Ms. Colbert alleges that the District of Columbia violated K.C's Fifth Amendment[5] rights; she asserts a claim for money damages pursuant to 42 U.S.C. § 1983.  She asserts a Fifth Amendment claim under five distinct legal theories:

(1) The District created a "special relationship" by taking K.C. into involuntary custody, and it violated K.C's right to substantive due process when it failed to protect her from harm by third parties (*i.e.* nonconsensual sex), *see* Am. Compl. ¶¶ 85-104;

(2) The District violated K.C's right to substantive due process by affirmatively endangering her, *see id.* ¶¶ 105-114;

(3) The District violated K.C's right to substantive due process because it was deliberately indifferent to her need for medical care (*i.e.* her need for birth control and prenatal care), *see id.* ¶¶ 115-119;

(4) The District violated K.C's right to equal protection, *see id.* ¶¶ 120-126; and

(5) The District violated K.C.'s right to substantive and procedural due process by failing to investigate instances of abuse and neglect pursuant to D.C. Code requirements, *see id.* ¶¶ 127-133.

The Court analyzes each theory separately.

---

[5] The Fifth Amendment provides that no person "shall be deprived of life, liberty, or property, without due process of law."  *See* U.S. Const. amend. V.  The Fourteenth Amendment is substantially the same and thus cases analyzing States' liability under the Fourteenth Amendment can be relied upon to analyze the District's liability under the Fifth Amendment. *See Piechowicz v. United States*, 885 F.2d 1207, 1214 n.9 (4th Cir. 1989).

### 1. Special Relationship (Involuntary Custody) Theory

Ms. Colbert alleges that K.C. was involuntarily in the custody of the District; the District did not provide an environment that was safe and adequate to meet her needs; the District did not restrict sexual activity by intellectually disabled individuals in its care; the District "encouraged and allowed" K.C. to engage in sex and become pregnant; the District failed to provide restrictions and protections for individuals such as K.C. who were incapable of consenting to sexual activity and susceptible to sexual exploitation; and that the District was so deliberately indifferent to K.C.'s needs as to shock the conscience.  Am. Compl. ¶¶ 85-104.

A citizen's liberty interest, protected by substantive due process, includes a right to be free of damage to bodily integrity and security caused by the State.[6]  *See Youngberg v. Romeo*, 457 U.S. 307, 316 (1982); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d, 443, 451 (5th Cir. 1994) (*en banc*).  In contrast, a State's failure to protect an individual from private violence (*i.e.*, harm caused by a third party such as alleged here), does not ordinarily constitute a violation of due process.  *Butera v. District of Columbia*, 235 F.3d 637, 647 (D.C. Cir. 2001).  However, "[w]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *Id.* (citing *DeShaney v. Winnebago County Social Servs. Dep't*, 489 U.S. 189, 199-200 (1989).

These precepts dictate that a State has an affirmative duty to protect an individual from third-party harm in two circumstances:  (1) when the State affirmatively endangers the individual or (2) when the State creates a "special relationship" by taking an individual into custody.  *DeShaney*, 489 U.S. at 199-201; *Butera*, 235 F.3d at 647-651.

---

[6] The Court uses the word "State" to indicate the District of Columbia as well as the 50 States.

Ms. Colbert alleges that the District failed to protect K.C. from "private violence," (*i.e.*, an unknown man impregnated K.C. without her consent) and that the District was deliberately indifferent to her need for medical care (birth control and prenatal care) while she was committed to District custody.  *See* Am. Compl. ¶¶ 85-104.  Via these claims, Ms. Colbert asserts a substantive due process claim under the "special relationship" theory.  This Court previously held that "only involuntary commitment triggers the District's constitutional duty of care to protect an individual from harm caused by non-state actors."  *See* Op. [Dkt. 22] at 18.[7]  In other words, to succeed on a claim under the special relationship theory, Ms. Colbert must prove that K.C. was involuntarily committed to the care of the District.  The threshold question— whether K.C. was committed to the custody of the District voluntarily or involuntarily—cannot be resolved on the current record.  It is not clear whether (a) the District of Columbia involuntarily committed K.C. to its custody or (b) K.C. was voluntarily committed to the District's custody—either by her own consent (with the legal capacity to do so) or by the consent of a legal guardian.

Jacqueline Colbert avers that K.C. was involuntarily in the custody of the District because the District "physically took Katina Colbert from the hospital when she was discharged [in 2008] and placed her in a supervised group home," *see* J. Colbert Aff. [Dkt. 45-1] ¶ 5, and that K.C. was "not given a choice regarding whether she was going to be placed in the custody of the District," *id*. ¶ 7.  Further, Ms. Colbert insists that she is not K.C.'s legal guardian, she has never been appointed to make medical or placement decisions for K.C., and she has never

---

[7] This Court agreed with the First, Second, Third, Fifth, and Ninth Circuits that the involuntary nature of the commitment determines whether the State has a constitutional duty of care.  *See* Op. at 12-18 (citing *Campbell v. State of Washington Dep't of Social & Health Servs.*, 671 F.3d 837 (9th Cir. 2011); *Torisky v. Schweiker*, 446 F.3d 438 (3d Cir. 2006); *Brooks v. Guiliani*, 84 F.3d 1454 (2d Cir. 1996); *Walton v. Alexander*, 44 F.3d 1297 (5th Cir. 1995) (*en banc*); *Monahan v. Dorchester Counseling Center*, 961 F.2d 987 (1st Cir. 1992)).

petitioned the District of Columbia to commit K.C. to its custody. *Id.* ¶¶ 4, 8, 9. She also notes

that, to her knowledge, no legal guardian has ever been appointed for K.C. *Id.* ¶ 10. The District

of Columbia just recently, on July 1, 2014, filed a Petition for the appointment of a Guardian Ad

Litem for K.C. *See* Surreply [Dkt. 51].

The District of Columbia contends that K.C. is in voluntary, not involuntary,

custody. The District implies that either Ms. Colbert consented to K.C.'s commitment or that

K.C. herself did. The District filed a form titled "Substituted Consent for Health Care

Decisions," signed by Jacqueline Colbert on February 4, 2011, two months before T.C. was born.

By executing this form, Ms. Colbert indicated that she was willing to provide consent for health

care decisions for K.C. Reply Exhibits [Dkt. 49-1], Ex. A (2011 Substituted Consent Form).[8]

The District also filed the affidavit of Winslow Woodland, Director of the Service Planning and

Coordination Division of the Developmental Disabilities Administration (DDA), D.C.

Department of Disability Services (DDS), stating that K.C.'s commitment was voluntary:

> 4. Through an independent contractor providing services under a
> Medicaid provider agreement and human care agreement, K.C.
> receives 24-hour supervised housing and other support services.
>
> 5. K.C.'s supervised housing is not court-ordered and she is not
> considered a ward by DDA/DDS.
>
> 6. Since being found eligible and commencement of services in
> 2005,[9] K.C. has never been court-ordered to receive DDA/DDS
> residential or other services.
>
> 7. K.C. receives DDA/DDS services on a voluntary admission
> basis and can be discharged from services at any time by providing
> written notice to DDA/DDS.

---

[8] The District filed another Substitute Consent form signed by Jacqueline Colbert on January 9,
2014. *See* Reply Exhibits [Dkt. 49-1], Ex. C (2014 Substitute Consent Form).

[9] The parties do not explain the facts surrounding the assertion that K.C. was eligible for services
in 2005.

Reply Exhibits [Dkt. 49-1], Ex. B (Woodland Aff.) ¶¶ 4-7.  The District, however, provides no

documents supporting Mr. Woodland's bald statement that K.C. received services on a

"voluntary admission basis."  K.C.'s ability to consent to such commitment is questionable,

given Dr. Lockwood's assessment of her reduced mental capacity in 2008.[10]  *See* Lockwood

Report at 1, 8.  The parties also dispute whether K.C. was free to leave the residential facility

during the relevant time period, 2010-2011.  *Compare* Am. Compl. ¶ 91 (K.C. "has not been free

to leave the District's custody since September 2008") *with* Woodland Aff. ¶ 7 (K.C. "can be

discharged from services at any time by providing written notice to DDA/DDS").  Ms. Colbert

asserts that K.C. can be discharged from Total Care only upon court approval under D.C. Code

§ 7-1303.08.  However, § 7-1303.08 deals with incompetent individuals who were committed to

a residential facility via court order.  Individuals who were voluntarily admitted to a facility

"have the right to immediate discharge from the facility upon written request to the Director of

the facility."  D.C. Code § 7-1303.07.

　　　　　Discovery is needed on these points.  While Ms. Colbert bears the burden of

demonstrating jurisdiction, the District of Columbia has possession, access, and/or control of

many, if not all, of the records necessary to clarify the matter.  The parties will be directed to

engage in limited discovery to ascertain the facts behind K.C.'s 2008 hospitalization,

---

[10] If K.C. "voluntarily" committed herself and the District failed to take steps to ascertain that
she was mentally competent to sign the admission forms, K.C. may have been "involuntarily"
committed.  *See Zinermon v. Burch*, 494 U.S. 113 (1990) (mentally ill patient admitted
voluntarily without verification he was competent to sign admission forms stated a § 1983 claim
for deprivation of his liberty interest without due process).  Under D.C. law effective September
2012, a person with an intellectual disability who is over the age of 14 can apply to the director
of a facility for voluntary admission to the facility for habilitation and care.  D.C. Code § 7-
1303.02(a).  The director of the facility must then notify the court and the court determines
whether the individual is competent to admit herself to the facility and whether the admission is
voluntary.  *Id.* § 7-1303.02(b), (c).  The statute in effect from 2008 through 2011 (when K.C.
lived in the Total Care facility) was the same in all material respects.  *See* D.C. ST § 7-1303.02
(effective Apr. 24, 2007 to Sept. 25, 2012).

psychological assessment, placement at Total Care, and subsequent approvals of her care to assist the Court in determining whether K.C. was voluntarily or involuntarily in the District's custody at the time she became pregnant (in 2010) and gave birth (in April 2011).

### 2. Endangerment Theory

Ms. Colbert also tries to state a claim under the "endangerment" theory.  *See* Am. Compl. ¶¶ 105-114.  "[U]nder the State endangerment concept, an individual can assert a substantive due process right to protection by the District of Columbia from third-party violence when District of Columbia officials *affirmatively act* to increase or create the danger that ultimately results in the individual's harm."  *Butera*, 235 F.3d at 651 (emphasis added).  "No constitutional liability exists where the State actors had no hand in creating a danger but simply stood by and did nothing when suspicious circumstances dictated a more active role for them."  *Id.* at 650.

The Amended Complaint asserts that the District of Columbia "knowingly renewed its the contracts with Total Care despite knowledge of abuse and neglect at Total Care" and that the District was "deliberately indifferent to the substandard quality of care" given to K.C.  Am. Compl. ¶¶ 108, 110.  Ms. Colbert does not allege any affirmative acts by D.C. officials that increased or created danger to K.C.  She alleges inappropriate contract renewal and deliberate indifference.  These allegations merely assert that District officials stood by while Total Care endangered K.C.  Because these allegations do not allege any affirmative action toward K.C. by District officials, the Amended Complaint fails to state a claim under the endangerment theory.

### 3. Deliberative Indifference to Medical Needs

Paragraphs 115-119 of the Amended Complaint repeat a portion of the "special relationship" claim set forth in paragraphs 84-104 by asserting that the District was so

deliberately indifferent to K.C.'s needs as to shock the conscience.  As explained above, the

District had an affirmative constitutional duty of care *only if* K.C. was involuntarily in the

custody of the District.  *See Estate of Phillips v. District of Columbia*, 455 F.3d 397, 406 (D.C.

Cir. 2006) (quoting *DeShaney*, 489 U.S. at 200-02) ("'[W]hen the State by the affirmative

exercise of its power so restrains an individual's liberty that it renders him unable to care for

himself, and at the same time fails to provide for his basic human needs,' such as in the custodial

context if the state restrains a person from acting on his own behalf, a 'special relationship'

exists which gives rise to an affirmative duty to protect that person.").  Again, discovery is

needed to determine whether K.C. was voluntarily or involuntarily in the District's custody at the

time she became pregnant and gave birth.  If she was voluntarily in the District's custody, Ms.

Colbert has failed to state a constitutional claim.

### 4. Equal Protection

Count IX also alleges that K.C.'s Fifth Amendment right to equal protection was

violated.  *See* Am. Compl. ¶¶ 120-126.  To allege an equal protection claim, a plaintiff must

assert that the government intentionally treated her differently from others who were similarly

situated and that there is no rational basis for the difference in treatment.  *3883 Conn. LLC v.

District of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir. 2003) (citing *Village of Willowbrook v.

Olech*, 529 U.S. 562, 564 (2000)).  Further, to state a claim against the District under § 1983, a

plaintiff must allege that a custom or policy of the District of Columbia caused the constitutional

violation.  *Feirson v. District of Columbia*, 506 F.3d 1063, 1066 (D.C. Cir. 2007) (citing *Monell

v. New York City Dept. of Social Servs.*,  436 U.S. 658, 694 (1978).

Ms. Colbert seeks to make out an equal protection claim by baldly asserting that

the District discriminated against K.C. based on gender by encouraging and facilitating sexual

relations for K.C. but not for similarly situated men. *See* Am. Compl. ¶¶ 121-122. The Court is not required to accept as true legal conclusions set forth in the Amended Complaint, *see Iqbal*, 556 U.S. at 678, and "while legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679. Ms. Colbert asserts no facts showing that the women were housed or supervised differently than the men. The Amended Complaint asserts no facts in support of the claim for discriminatory treatment and no facts in support of a claim that a D.C. custom or policy violated K.C.'s equal protection rights. Instead, the equal protection claim repeats the substantive due process claim, alleging that the District violated K.C.'s "right to be free from harm and to have adequate health and habilitative care to protect her from dangerous unprotected sexual activity and unwanted pregnancy" *Id*. ¶ 125. The Amended Complaint fails to assert an equal protection claim and the claim will be dismissed.

### 5. Due Process Violation Due to Failure to Investigate Abuse and Neglect

Ms. Colbert also ventures to make out a due process claim under an "entitlement theory" by alleging she was denied procedural due process rights provided by D.C. Code § 7-1305.10(e) and (f), which require that the District investigate instances of neglect, abuse, and mistreatment.[11] *See* Am. Compl. ¶¶ 127-133. Because District officials failed to investigate the

---

[11] D.C. Code § 7-1305.10(e) and (f) provide:

> (e) Alleged instances of mistreatment, neglect or abuse of any individual shall be reported immediately to the Director and the Director shall inform the individual's counsel, parent or guardian who petitioned for the commitment, and the individual's advocate for a person with an intellectual disability of any such instances. There shall be a written report that the allegation has been thoroughly and promptly investigated (with the findings stated therein). Employees of facilities who report such instances of mistreatment, neglect, or abuse shall not be subjected to adverse action by the facility because of the report.

abuse and neglect of K.C., Ms. Colbert contends that her procedural and substantive due process

rights were violated.  However, Ms. Colbert does not allege that the District had notice of the

alleged abuse and neglect.  Without an allegation of notice, she has failed to state a claim.

### 6.  Denial of Fundamental Right

In her opposition brief, Ms. Colbert strives to retain her Fifth Amendment

substantive due process claim by asserting a new legal theory not alleged in the Amended

Complaint—that the District of Columbia interfered with K.C's fundamental right to use

contraceptives under *Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965).[12]  *See* Opp'n [Dkt.

47] at 21.

"It is axiomatic that a complaint may not be amended by the briefs in opposition

to a motion to dismiss."  *Arbitraje Casa de Cambio, S.A. de C.V. v. United States Postal Serv.,*

297 F. Supp. 2d 165, 170 (D.D.C. 2003) (quoting *Coleman v. Pension Benefit Guar. Corp.,* 94 F.

Supp. 2d 18, 24 n. 8 (D.D.C. 2000)); *see also Shanahan v. City of Chicago,* 82 F.3d 776, 781

(7th Cir. 1996) (finding that allegations in response to summary judgment motion are not

---

(f) An individual's counsel, parent or guardian who petitioned for commitment and an individual's advocate for a person with an intellectual disability shall be notified in writing whenever restraints are used and whenever an instance of mistreatment, neglect or abuse occurs.

[12] Substantive due process protects the rights to marriage, procreation, and bodily integrity, *see Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 847-49 (1992), and these rights are afforded to mentally handicapped individuals, *see Vaughn v. Ruoff*, 253 F.3d 1124, 1128 (8th Cir. 2001) (citing *City of Cleburne v. Cleburne Living Ctr*., 473 U.S. 432, 447 (1985)).  Before the State may deprive an individual of a protected liberty interest, due process requires the State to provide meaningful procedural protections.  *See Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 570 n. 7 (1972).  Strangely, by asserting K.C.'s right to contraception, Ms. Colbert now impliedly argues that K.C. had the intellectual capacity to consent to sex and to choose not to conceive.

sufficient to amend complaint).  This new legal theory, that the District of Columbia violated

K.C.'s fundamental right by denying her access to birth control is not before the Court.

### 7.  Custom or Policy

Even assuming that Ms. Colbert's one of the theories discussed above stated a

claim, the District insists that all of Count IX should be dismissed for failure to allege that a D.C.

custom or policy caused the alleged constitutional violation.  Under § 1983, constitutional claims

against municipalities require a plaintiff to allege *both* that her constitutional rights have been

violated *and* that a custom or policy of the municipality caused the violation.  *See Baker v.*

*District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003); *see also Monell v. Dep't of Social*

*Servs.*, 436 U.S. 658, 694 (1978).

Ms. Colbert contends that the District of Columbia has a policy of deliberate

disregard for the medical needs for those under its care, *see* Am. Compl. ¶ 118, relying on *Evans*

*v. Williams*, 139 F. Supp. 2d 79 (D.D.C. 2001).  *Evans* approved a settlement between the

District of Columbia and a class of disabled individuals to remedy the District's failure to

provide adequately for their health, safety, and welfare.  The class consisted of individuals who

resided at a facility called Forest Haven, since closed, as a result of an involuntary commitment.

*See Harvey v. Mohammed*, 841 F. Supp. 2d 164, 187 (D.D.C. 2012) (describing *Evans*).  The

*Evans* court held that the D.C. Mental Retardation and Developmental Disabilities

Administration (MRDDA) had continuously failed to comply with court orders regarding health,

safety, and welfare of disabled persons at Forest Haven.  *Evans v. Fenty*, 480 F. Supp. 2d 280,

298, 325 (D.D.C. 2007).  Subsequently, the existence of a D.C. policy of disregard for the

medical needs of disabled individuals could be established by *Evans* class members through

reliance on the *Evans* settlement.  *See, e.g.*, *Harvey*, 841 F. Supp. 2d at 187.

Despite the fact that she was not an *Evans* class member, Ms. Colbert similarly relies on the *Evans* finding that the District of Columbia has a long-standing custom of failing to attend to the medical needs of the disabled.  Even though MRDDA has been replaced by the Department on Disability Services (DDS), *see Evans v. Fenty*, 701 F. Supp. 2d 126, 137-38 (D.D.C. 2010), and DDS has brought the District into compliance with some areas specified by the *Evans* consent orders,[13] Ms. Colbert alleges that the D.C. policy of disregard for the medical needs of intellectually disabled persons in its care continued during the relevant time period, 2010-2011.  *Evans* in fact provides some support for Ms. Colbert's claim.  Ms. Colbert alleges that the District, through its policy of disregard, failed to provide 24-hour supervision, protection from nonconsensual sex, adequate birth control, and prenatal care.[14]  These allegations are sufficient to survive the District's motion to dismiss and enable discovery to proceed on the issue of whether a D.C. custom or policy was the moving force behind the alleged violation  of K.C.'s constitutional rights in 2010-2011.

### B.  Count XII—Title IX Claim Against the District and Total Care

Ms. Colbert also attempts to state a claim under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.  Title IX provides:

---

[13] *See Evans v. Gray*, Civil No. 76-293(ESH), 2012 WL 5305790, at *1 (Oct. 26, 2012) (the District has complied with the consent orders regarding three of nine areas—staff training, safeguarding personal possessions, and adequate budget; *but see* Exhibit 5 to Opp'n [Dkt. 45-5], *Evans* Monitor Report (June 2009) at 3-4 (noting failures of one-on-one staffing and inadequate health care).

[14] The District also points out that "[p]leading a single instance of a constitutional violation—that does not itself establish municipal policy—without connecting it to an existing unconstitutional policy is not sufficient to state a claim under § 1983."  MSJ at 23 (quoting *Trimble v. District of Columbia*, 779 F. Supp. 2d 54, 58 (D.D.C. 2011).  Ms. Colbert does not assert a "single instance" of a constitutional violation.  She alleges the K.C. was not properly supervised, that she had multiple nonconsensual sexual encounters without adequate birth control, and that during her pregnancy she received little to no prenatal care.

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance.

*Id.* § 1681(a). The Act was intended to prevent gender discrimination in education.

The Title IX claim must be dismissed because Ms. Colbert fails to allege that K.C. was denied educational services based on her gender. The Amended Complaint alleges:

> 139. Defendant Total Care discriminated against [K.C.] based on her sex because while it facilitated and encouraged her to engage in sexual intercourse with other residents, staff and strangers, it did not similarly facilitate and encourage men to do the same.

> 140. Defendant Total Care created a hostile and sexually charged environment which interfered with [K.C.'s] habilitation and education.

> 141. Defendant District of Columbia was deliberately indifferent to the hostile environment and sexual discrimination at Total Care.

Am. Compl. ¶¶ 139-141.

With regard to the District of Columbia, Ms. Colbert does not allege that it received federal funding to provide educational programs to K.C. Thus, she has failed to state a Title IX claim against the District and the claim will be dismissed.[15] With regard to Total Care, Ms. Colbert asserts that Total Care received federal funding to provide unspecified vocational and educational services to K.C., *see* Am. Compl. ¶ 137, and that Total Care's programs are educational because Total Care is required to create a plan of "habilitation," *i.e.*, to assist mentally disabled individuals in acquiring and maintaining "life skills," *see* D.C. Code § 7-1301.03(14) (defining "habilitation"). The Eighth Circuit has reasonably rejected such a broad

---

[15] Ms. Colbert withdrew the Title IX claim against the District, while attempting to reserve her "right" to re-plead it in a possible future amended Complaint. *See* Opp'n [Dkt. 47] at 40. Because Ms. Colbert has failed to state a Title IX claim, the Court does not recognize any "right" to re-plead the claim and it will be dismissed with prejudice.

application of Title IX, finding that the "ordinary meaning of education is very broad and could

conceivably encompass every experience in life. . . . Title IX deals more specifically with

'education programs.'" *Roubideaux v. North Dakota Dept. of Corrections & Rehabilitation*, 570

F.3d 966, 977 (8th Cir. 2009).  In *Roubideaux*, the court determined that a vocational program

that offered college and computer classes was an educational program covered by Title IX, while

a work program that included  learning opportunities was not an educational program covered by

Title IX.  *Id*. at 977-78.  In the work program, learning was incidental and not the main focus of

the program.  *Id*.  Here, Total Care provides housing and residential services, and the life skills

training that is part of habilitation is incidental.  Further, the bald allegation that K.C. was subject

to sexual harassment that interfered with her education is insufficient to state a Title IX claim.

*See Iqbal*, 129 S. Ct. at 1949 (a court need not accept as true legal conclusions set forth in a

complaint).  Count XII will be dismissed.

### C.  Count XIII—Rehab Act Claim Against the District and Total Care

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a

disability . . . shall, solely by reason of his or her disability . . . be excluded from participation in,

be denied the benefits of, or be subjected to discrimination under any program or activity

receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a) (also known as the Rehab Act).[1]

In support of her Rehab Act claim, Ms. Colbert asserts:

> 148.  Because of her mental disabilities, [K.C] was vulnerable to
> sexual assault and nonconsensual sex and pregnancy.
>
> 149.  Defendants knew that in order for Colbert to enjoy the
> benefits and services of her residential program, she required

---

[1] Ms. Colbert asserts that the District and Total Care received federal funding and thus are covered by the Rehab Act.  Am. Compl. ¶ 146.

accommodation for her disability through 24-hour supervision and adequate birth control.

150. Defendants failed to reasonably accommodate [K.C.'s] disability, failed to provide adequate supervision and failed to provide adequate birth control. Defendants exacerbated the harm to [K.C.] by facilitating and encouraging her to have sexual conduct with residents, District contractors and other strangers.

Am. Compl. ¶¶ 148-150.

Ms. Colbert has failed to state a disparate treatment claim under the Rehab Act. The purpose of the Act is to "eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied." *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998). Total Care's sole purpose is to provide housing and residential services to the disabled. Ms. Colbert did not and cannot allege that Total Care (under contract with the District)[16] treated K.C. differently than able-bodied individuals because Total Care did not provide services to the able-bodied.

In an effort to save her Rehab Act claim from dismissal, Ms. Colbert asserts, without more, that Total Care failed to "reasonably accommodate her disability." Again, to allege a Rehab claim, a plaintiff must assert discrimination "*solely by reason of* his or her disability." Ms. Colbert has made no such allegation. She does not assert that Total Care or the District denied K.C. adequate supervision, access to birth control, or access to prenatal care *solely based on* her disability. Instead, she attempts to use the Rehab Act to challenge the adequacy of services provided to K.C. Such a claim is beyond the scope of the Rehab Act. The Act prohibits discrimination based on disability; it does not impose a standard of care or a minimum level of services that must be provided to the disabled. *See, e.g.*, *M.K. v. Sergi*, 554 F.

---

[16] Ms. Colbert's Rehab Act allegations lie against the District based only on its role as the entity that contracted with Total Care.

Supp. 2d 201, 230 (D. Conn. 2008) (the Rehab Act's antidiscrimination provision cannot be used to challenge the adequacy of services to a mentally disabled child).

## IV.  CONCLUSION

For the reasons set forth above, the motion to dismiss or for summary judgment filed by the District of Columbia [Dkt. 34] and the motion for partial dismissal filed by Total Care [Dkt. 32] will be granted in part and denied in part.  The following claims will be dismissed:  those portions of Count XI alleging endangerment (Am. Compl. ¶¶ 105-114), equal protection (*id*. ¶¶ 120-126), and deprivation of due process under an entitlement theory (*id*. ¶¶ 127-133); all of Count XII alleging a violation of Title IX of the Education Amendments (*id*. ¶¶ 134-144); and all of Count XIII alleging a violation of the Rehabilitation Act (*id*. ¶¶ 145-153). The motions will be denied without prejudice as to all other claims.

The parties will be required to meet and confer and file a joint proposed schedule for limited jurisdictional discovery regarding Jacqueline Colbert's sole remaining federal claim —the Fifth Amendment substantive due process claim against the District of Columbia based on the theories of special relationship and deliberate indifference.  The parties shall engage in limited discovery to determine whether K.C. was voluntarily or involuntarily committed to the custody of the District of Columbia in 2010-2011 and to determine whether a D.C. custom or policy was the moving force behind the alleged substantive due process violation.  A memorializing Order accompanies this Opinion.

Date:  January 12, 2015

_____/s/_____

ROSEMARY M. COLLYER
United States District Judge